**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
DANIELA FLORES, on behalf of herself, FLSA
Collective Plaintiffs, and the Class,

                                Plaintiff,

           -against-

MISSION CEVICHE, LLC,
       d/b/a   MISSION CEVICHE,
MISSION CEVICHE UES INC.
       d/b/a   MISSION CEVICHE,
MISSION CEVICHE CANAL LLC,
       d/b/a MISSION CIVICHE,
JOSE LUIS CHAVEZ,
BRICE MASTROLUCA, and
MIGUEL YARROW,

                            Defendants.
------------------------------------------------------------------X

**24-CV-3626 (KHP)**

**OPINION AND ORDER ON MOTON TO CERTIFY A CLASS UNDER RULE 23**

**KATHARINE H. PARKER, United States Magistrate Judge**

Plaintiff Daniela Flores worked as a server for Mission Ceviche restaurant on Second Avenue in the Upper East Side of Manhatton from on or about August 2022 through April 2023. She filed this suit in May 2024 for herself and on behalf of similarly situated employees of three Mission Ceviche entities and three of their individual owners/managers[1] for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* and the New York Labor Law ("NYLL"), § 190 *et seq.*, in connection with Defendants' alleged failure to pay all earned wages, including overtime wages, due to an alleged policy of time shaving and use of an invalid tip credit, filing to pay spread of hours premium, improperly deducting meal credits, and failing to provide

---

[1] The Court refers to the Defendants as "Mission Ceviche" and to the Second Avenue location, which is separately incorporated, as "Mission Ceviche UES."

appropriate new hire wage notices and wage statements.  (ECF No. 1 ["Compl."] ¶¶ 1, 28.)  She also alleges she was terminated in retaliation for complaining about how Mission Ceviche handled tips in violation of federal and state law. (Compl. ¶¶ 74-77.)

On November 26, 2024, the Court granted Plaintiff's motion for "conditional certification" under 29 U.S.C. § 216(b), certifying a collective of "all non-exempt employees employed by defendants at any location on or after October 19, 2017."  (ECF No. 48, at 1.) Thereafter, notice of this action was sent to individuals who worked at Mission Ceviche.  Only two individuals decided to opt-in to the collective – Johnny Rivas and Carlos Torres.  (ECF Nos. 76, 77.)  It is unclear what positions the opt-in Plaintiffs held.

Discovery was initially scheduled to end December 13, 2024. It was later extended to March 17, 2025.  (ECF No. 67.)  It was then extended to April 30, 2025, and then to June 5, 2025.  (ECF Nos. 75, 81.)  The Court indicated that Plaintiff's deposition had to be conducted by June 5, 2025, and that discovery deadlines would not be extended further.  (ECF No. 81.)  The parties did not take any depositions during discovery.

Presently before the Court is Plaintiff's motion pursuant to Federal Rule of Civil Procedure 23 ("Rule 23") for certification of all current and former non-exempt front-of-house and back-of-house employees (including delivery persons, servers, runners, bussers, porters, bartenders, barbacks, cooks, and dishwashers) who were employed at Mission Ceviche's Second Avenue restaurant from October 19, 2017 until the date of certification.[2]  Plaintiff also moves to

---

[2] The parties entered into a tolling agreement on October 19, 2023 that tolled the statute of limitations.  That agreement was later extended by the parties.  (ECF No. 51-1.)

certify a subclass consisting of that portion of the above-described group of employees who received tips.  As the Court understands it, the individuals in the larger group consist of individuals whose wages were impacted by improper meal deductions, who did not receive spread of hours pay, and who did not receive proper new hire wage notices and wage statements, whereas the proposed subclass would consist of those employees whose pay was impacted by an improper tip credit and miscalculation of overtime under the tip credit.[3]

After careful consideration of the parties' submissions and arguments at the oral argument on the motion held on September 2, 2025, the motion for class certification is denied, except as to a class of front-of-house tipped employees of Mission Ceviche UES with respect to their claim they are due additional wages because of various deficiencies with the tip credit notice and computation of pay rates of front-of-house tipped employees as discussed in more detail below.

## BACKGROUND FACTS[4]

Mission Ceviche used to operate two ceviche stands in New York City and one in Connecticut.  Those locations all closed as a result of the COVID-19 Pandemic and never

---

[3] The Court notes that the proposed class and subclass in the motion are narrower than those mentioned in the complaint insofar as the proposed class in the motion is limited to employees of Mission Ceviche UES.

[4] These background facts are taken from the class certification submissions as well as the pleadings and other filings.  In support of the motion, Plaintiff submitted payroll records for portions of calendar years 2021 (23 weeks), 2022 (23 weeks), and 2023 (17 weeks), Defense Counsel's "analysis" of the payroll records (which purports to compute the amount of meal credits deducted and minimum wage and overtime due to the employees reflected on the payroll), Defendant's Responses and Objections to Discovery Requests, and Defendants' Employee Handbook.  Plaintiff also incorporates by reference Plaintiff Flores' Declaration submitted in connection with her motion for conditional certification.  (ECF No. 42 ["Flores Decl."])  In opposition to the Motion, Defendants submitted the Declaration of Brice Mastroluca, co-founder and co-owner of Mission Ceviche UES Inc., along with certain payroll records and emails related to employee requests to remove deductions for meal breaks.  (ECF No. 57 ["Mastroluca Decl."].)

reopened.  (Mastroluca Decl. ¶¶ 3-5.)  The Second Avenue restaurant, Mission Ceviche UES, opened in or about 2019 and has continued operating, although it was shut down between March and July 2020 pursuant to mandatory shutdown orders applicable to New York City Restaurants.  (*Id*. ¶ 5; *see also Business Closures, Stay-at-Home Restrictions, and COVID-19 Testing Outcomes in New York City*, Center for Disease Control & Prevention (Sept. 17, 2020) (referencing business closures), https://perma.cc/6JNX-KEMS (last visited September 11, 2025); Jen Carlson, *Everything You Need to Know About Phase 3 of Reopening NYC*, Gothamist (July 6, 2020) (announcing Phase 3 reopening in New York City), https://perma.cc/9BLS-AZ5U (last visited September 11, 2025).)  Defendants Chavez, Mastroluca, and Yarrow were in charge of the restaurant and supervised employees.  (Flores Decl. ¶ 2; ECF No. 51-2, at 6 (identifying Mastroluca and Chavez as owners/founders and Yarrow as general manager).)  During oral argument on this motion, counsel represented that there are approximately 68 front-of-house employees at Mission Ceviche UES.  Payroll records reflect over 100 total employees at the Second Avenue location.  (*See generally* ECF No. 51-4.)

Mission Ceviche UES operates 12:00 p.m. to 10:00 p.m. Monday through Thursday, 12:00 p.m. to 10:30 p.m. on Friday, 11:00 a.m. to 10:30 p.m. on Saturday, and 11:00 a.m. to 10:00 p.m. on Sunday.  (Mastroluca Decl. ¶ 6.)  Mission Ceviche UES schedules employees to work specific shifts.  Shifts include coming in before the restaurant opens to prepare for the day or staying after the restaurant closes to clean, break down tables and count tips.  (*Id.* ¶ 7.)

Plaintiff Flores corroborates that employees were scheduled to work in shifts.  She says that tipped workers started their shift one hour before the restaurant opened.  For example, she came in at 10:00 a.m. when the restaurant opened at 11:00 a.m.  (Flores Decl. ¶ 7.)  She

states that dinner service ended at 11:30 p.m. at that she and other tipped workers had to stay about one hour after closing.  (*Id.* ¶ 8.)  However, other evidence strongly suggest that Plaintiff is mistaken about the closing time of Mission Ceviche UES based on the declaration of Mastroluca, the restaurant's website, and a screen shot of the restaurant's website submitted by Plaintiff.  Notably, Plaintiff's declaration does not provide the precise opening and closing times of the restaurant for different days of the week and does not state what the hours of the two shifts were or even what her shifts were.[5]

Records show Flores worked at Mission Ceviche UES from on or about August 15, 2022, to on or about April 17, 2023.  (ECF No. 51-5, at 92; Compl. ¶ 34; *but see* Flores Decl. ¶ 1 (noting a termination date around August 2023).)  She attests she typically worked four days per week and eight hours a day for a total of thirty-two hours a week.  (Compl. ¶ 35.)  She alleged that she was "frequently" asked to work overtime hours, but points to only one week during her employment when she worked 6.53 hours of overtime in the Complaint--her declaration is silent regarding the overtime she worked.  (Compl. ¶ 35.)  She alleges in the Complaint that once a week she was required to stay an additional thirty minutes past her shift and was not paid for that shift; however, this allegation is not repeated in her declaration or supported by payroll records, and she identifies only one week when this occurred.  (*Compare* Compl. ¶¶ 38-39, *with* ECF No. 42.)

---

[5] Plaintiff submitted from an undated website page showing the restaurant closed at 9:30 p.m.—not 11:30 p.m. ECF No. 41-5. This document also suggests the restaurant opened at 12:00 *a.m.*, which the Court believes to be a typo based on all the other evidence submitted and that in fact the opening time was 12:00 *p.m.*  The hours listed on the current website are consistent with what is contained in Mastroluca's declaration. "Upper East Side Location," Mission Ceviche, https://perma.cc/9BLV-Z54T (last visited September 11, 2025).

During her employment, Plaintiff was compensated at the tip credit minimum wage of $10 per hour and the overtime rate of $15 per hour for a portion of her employment period.[6] (Flores Decl. ¶ 4 & Ex. B.)  According to Plaintiff, Defendant Yarrow demanded that all tipped employees work for half an hour (.5 hour) to count tips twice per month – resulting in 1 hour of off-the-clock time per month.  (*Id.* ¶ 5.)  According to Plaintiff, a server named Giorman Moreno once told her that he worked more hours than shown on his paystub – however, she does not provide any specifics about how many such off-the-clock hours he worked.[7]  (*Id.* ¶ 6.)  Plaintiff also suggests that runners Carlos Torres and Nelson Stalin and bussers Victoria[8] and Ricardo Cubillan told her that their paystubs did not reflect all hours worked.  But, again, she does not provide any specifics about this.  (*Id.*)

Payroll records submitted by Plaintiff show total hours varied for servers, with many servers working fewer than 40 hours per week and overtime varying across the board.  (ECF No. 51-3 & 51-4; *see also* ECF No. 41-9 (showing variation in overtime hours).) Plaintiff alleges that Mission Ceviche UES improperly computed the overtime rate for tipped employees to be 1.5

---

[6] For at least one pay period -- the pay period ending August 21, 2022 -- she appears to have been paid a minimum wage rate of $15 hour. (Flores Decl., Ex. B.)

[7] To the extent that Plaintiff Flores recites hearsay in her declaration, the Court gives it little weight.  *See Fernandez v. Wells Fargo Bank*, N.A., 12-cv-7193 (PKC), 2013 WL 4540521, at *8 (S.D.N.Y. Aug. 1, 2014) (considering plaintiffs' declarations and finding "proof of a common policy . . . limited because of the lack of detail concerning the underlying communications" including that the "declarations include[d] no dates (not even approximations)," nor did "[t]hey identify [any] of the speakers or participants."); *Stewart v. Hudson Hall LLC*, No. 20-cv-885 (PGG) (SLC), 2021 WL 6285227, at *10 (S.D.N.Y. Nov. 29, 2021) (observing that "anecdotal hearsay" is insufficient to demonstrate a widespread policy of failing to pay employees overtime); *Barfield v. N.Y. City Health & Hosp. Corp.*, No. 05-cv-6319 (JSR), 2005 WL 3098730, at *1 (S.D.N.Y. Nov.18, 2005) (disregarding hearsay evidence of compensation policy); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011) (implying in dicta that evidence submitted in connection with class certification motion must meet admissibility of evidence standard); *Lujan v. Cabana Management, Inc.*, 284 F.R.D. 50 (E.D.N.Y. 2012) (noting not appropriate to consider hearsay in opposition to decertification of FLSA collective that had been "conditionally certified").

[8] Victoria's last name is not provided.

times $10 per hour rather than 1.5 times the minimum wage rate of $15 per hour. (Compl. ¶¶ 40-41.) Defendants do not dispute that they applied the wrong overtime rate and that it should have been $17.50 per hour. Plaintiff also alleges that Mission Ceviche was not entitled to pay the tip credit rate of $10 per hour because, among other reasons, it did not provide a tip credit notice that complied with New York law, did not compute the overtime rate correctly, did not maintain a daily log of tips, and included non-tipped employees in the tip pool.

Defendant disputes that it included non-tipped employees in the tip pool. According to Mastroluca's declaration, tips of tipped staff have never been given to non-tipped staff and the restaurant itself has never retained the tips of tipped staff. (Mastroluca Decl. ¶¶ 8, 10.) This conflicts with Plaintiff's declaration in which she states that she "recall[s]" that non-tipped employees who were silver polishers and floaters participated in the tip pool.[9] (Flores Decl. ¶ 10.) Plaintiff identifies Seth Rivera as a non-tipped employee who "only polished glassware and silver" as someone who was included in the tip pool – an assertion she makes because she only saw him polishing silver and glassware and not bussing. (*Id*.) She also identifies Isaias Santiago Garcia as a busser who did not actually perform the tipped work of a busser – an assertion she makes in her motion based on her counsel's interpretation of an "XXXX" appearing on some tip records. (*Id*. ¶ 11 & Ex. 1.) Similarly, Plaintiff suggests employees "Valentino and Abraham" were included in the tip pool even though they were marked as polishers and "floaters." (*Id*. ¶ 10.) She provides no information about what "floaters" did.

---

[9] In her declaration, Plaintiff complains that she had to give some of her tips to Gorman Moreno, another server, and speculates that a portion of his tips "probably" when to a non-tipped employee or management. Since Moreno, as a server, was entitled to participate in the tip pool, this allegation carries little weight in considering the appropriateness of class certification of the requested tipped employee subclass. (Flores Decl. ¶ 12.)

Mastroluca submitted a declaration stating that Rivera was in fact a busser, as were other employees whose pay records show them as bussers. (Mastroluca Decl. ¶ 9 & Ex. 1.) He explains that on busy nights, bussers assigned to less busy sections did in fact sometime polish in addition to serving customers. (*Id*.) He also explains that floaters were bussers assigned to less busy sections who assisted bussers in busier sections in providing service to customers, meaning they were properly included in the tip pool. (*Id*.) The handbook Plaintiff submitted with her motion contains a detailed section about tipping and tip credits and tip reporting. (ECF No. 51-5, at 40-42.) It states that the tip credit allowable under law will be applied to the hourly wages of any "Food Service" and/or "Service" employee (i.e., only those eligible for tips). (*Id*. at 41.) It makes clear that the amount paid shall equal the cash wage and the amount of tips received, which must be at least equal to the minimum wage then in effect. (*Id*. at 41-42.) It also states that if a tipped employee does not earn an average of at least the full minimum wage per hour after tips are included over the course of a week, additional wages are required, and Mission Ceviche will pay the balance to make up the difference. (*Id.* at 40.) Payroll records submitted by Plaintiff reflect back pay and retroactive pay being made to employees. It is unclear whether these payments were made to make up for times when a tipped employee did not earn at least the full minimum wage or something else. The parties do not provide further information about this in their submissions.

With regard to off-the-clock time, Plaintiff's declaration states that employees were made to work off-the-clock for about one hour a month. (Flores Decl. ¶ 8.) She also asserts generally that five other co-workers told her that their pay did not reflect all hours worked but provides no details whatsoever about this. (*Id.* ¶ 6.)

Plaintiff states that meal credit deductions were improperly made to her pay because there was not enough food for her when it was her time for a break, because Defendants did not provide a fruit or vegetable as part of the meal, and because she was only offered soda.[10] (*Id.* ¶ 13.)  Plaintiff's paystubs reflect that a meal credit was deducted from her paycheck.  (*Id.* ¶ 13 & Ex. 2.)  Defendants contend that Mission Ceviche UES provided family meals to its employees that included a salad, a protein, and some form of grain.  Employees were free to help themselves to tea, coffee, milk, or juice as well.  (Mastroluca Decl. ¶¶ 11-12.)  Employees were advised that if they did not want a meal credit deduction applied to their paycheck, they could request that it be removed.  And, indeed, evidence submitted shows some employees did request that the meal credit deduction be removed.  (*Id.* ¶ 11 & Ex. 2.)

Plaintiff identifies four co-workers who had meal credits deducted from their paystubs and states, based on hearsay, they did not want such deductions.  (Flores Decl. ¶ 14.)  However, she does not state whether any of those employees ever asked for the meal credit deduction to be removed.  Nor does she dispute that she was advised that employees could request that it be removed.  Payroll records submitted by Plaintiff reflect some servers had deductions for meals and others did not, corroborating Defendants' evidence about meal credit deductions.  (ECF No. 51-4.)  Likewise, the handbook submitted by Plaintiff states that employees "are relieved of all duties during the break periods and must clock in and out during their break period."  (ECF No. 51-5, at 37.)  It also states that meal breaks are unpaid and that employees

---

[10] Applicable regulations require meals to include adequate portions of a "variety of wholesome, nutritious foods and shall include at least one" fruit or vegetable, grain or potato, protein, and beverage (i.e., tea, coffee, milk or juice).  12 N.Y.C.R.R. 146-3.7.  Here, Plaintiff's declaration asserts she did not get a salad and was not offered beverages other than soda.

are not allowed to voluntarily waive their break periods. (*Id*.) Finally, it states that if an employee believes there has been an improper deduction from their pay or that they have not been paid for all hours worked and there is an error, they should report it to their manager and that there will be no retaliation for reporting an improper deduction. (*Id*. at 43, 45.) Thus, the handbook partially corroborates what Defendants say was the policy about meal breaks.

Although the Complaint purports to raise a claim about failure to pay spread-of-hours pay, Plaintiff makes no statements in her declaration about spread-of-hours pay. The handbook she submitted with her motion states that hourly employees receive an extra hour of pay at the basic minimum hourly rate in addition to pay for the actual hours worked when their workday is longer than ten hours. (ECF No. 51-5, at 38.)

Plaintiff attests that she received wage statements but that they failed to state the proper base hourly and overtime rate, the correct number of hours she worked, or the correct tip amounts based on Defendants' use of an incorrect overtime rate, failure to provide a proper tip notice, and failure to account for her off-the-clock time. She fails to provide any specifics when referencing her paystubs. (Flores Decl. ¶¶ 15-16.) She also generally states that based on her "personal observations and conversations," co-workers had improper wage statements. (*Id*.) She does not provide any specifics about this or reference their specific paystubs. Plaintiff says nothing in her declaration about a new hire notice. Nor does her declaration state how she was specifically injured by any deficient notice or wage statement.

## LEGAL STANDARD

Class treatment is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979);

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). The class representative must "possess the same interest and suffer the same injury as the class members." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974); *Dukes*, 564 U.S. at 349.

Federal Rule of Civil Procedure 23 sets forth the criteria that must be met for a case to proceed as a class action. Rule 23(a) requires that (1) the class be "so numerous that joinder of all members is impracticable;" (2) there are "questions of law or fact common to the class;" (3)"the claims or defenses of the representative parties are typical of the claims or defenses of the class;" and (4) the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

In addition, implied in Rule 23(a) is the requirement that membership of the class be objectively ascertainable. *In re Petrobras Sec. Litig.*, 862 F.3d 250, 260 (2d Cir. 2017). This requirement "demands that a class be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Id.* (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)) (internal quotation marks omitted). "A class is ascertainable when defined by objective criteria ... and when identifying its members would not require a mini-hearing on the merits of each case." *Brecher*, 806 F.3d at 24–25. Provided the above criteria are satisfied, the plaintiff also must show that one of the three requirements of Rule 23(b) is met.

In this case, Plaintiff argues the requirements of Rule 23(b)(3) are met. That provision requires the court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P.

23(b)(3).  The Rule lists four matters courts must consider in evaluating whether Rule 23(b)(3) is

satisfied.  They include:  "(A) the class members' interests in individually controlling the

prosecution or defense of separate actions; (B) the extent and nature of any litigation

concerning the controversy already begun by or against class members; (C) the desirability or

undesirability of concentrating the litigation of the claims in the particular forum; and (D) the

likely difficulties in managing the class action." *Id*. These listed matters are not exhaustive,

however. Advisory Committee Notes to Rule 23 (1966).  For example, where the amounts at

stake for individuals are small, separate suits may be impracticable for not only the putative

class members, but also burdensome on the party opposing the class and the court. *Id.*

The Advisory Committee Notes explain that certification under Rule 23(b)(3)

"encompasses those cases in which a class action would achieve economies of time, effort, and

expense, and promote uniformity of decision as to persons similarly situated, without

sacrificing procedural fairness or bringing about other undesirable results." *Id*.  As to the

predominance requirement, the notes explain that predominance can be satisfied "despite the

need, if liability is found, for separate determination of the damages suffered by individuals

within the class." *Id*. In contrast, class treatment "ordinarily" is not appropriate in situations

where there is a likelihood that "significant questions, not only of damages but of liability and

defenses of liability, would be present, affecting the individuals in different ways." *Id*.  At

bottom, the class action procedure must be superior to other ways of proceeding. *Id*.  The

superiority requirement challenges the court to ascertain whether the class procedure is the

most practical way of handling the "total controversy" and achieving efficiencies by reducing

repetitious discovery, motion practice and the like. *Id*.

Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). Additionally, "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class." Fed. R. Civ. P. 23(c)(5). The court also may alter or amend a decision granting or denying class certification before final judgment. Fed. R. Civ. P. 23(c)(1)(C).

A motion for class certification should not become a "mini-trial of substantial portions of the underlying litigation;" the question before the Court is whether the plaintiff meets Rule 23's requirements, not whether the plaintiff will prevail on the merits. *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006), *decision clarified on denial of reh'g*, 483 F.3d 70 (2007).  At the same time, the Court's analysis under Rule 23 must be "rigorous," *Dukes*, 564 U.S. at 351, which may require it to "probe behind the pleadings" and consider issues that "overlap with the merits of the plaintiff's underlying claim." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013) (internal quotation marks and citations omitted).

Plaintiffs bear the burden of showing that Rule 23's requirements are satisfied by at least a preponderance of the evidence. *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013). In determining the appropriateness of class certification, the court may consider the parties' pleadings, declarations and appended supporting materials. *Heredia v. Americare, Inc.*, No. 17-cv-6219 (WHP), 2018 WL 2332068, at *2 (S.D.N.Y. May 23, 2018) ("[A] court may consider material outside the pleadings in determining the appropriateness of class certification").

**DISCUSSION**

Defendant argues that class certification should be denied because Plaintiff has not satisfied Rule 23(a) commonality or typicality and is not an adequate representative insofar as she has interests that conflict with employees who she claims should not have participated in the tip pool.  They also argue that Plaintiff has not satisfied Rule 23(b)(3) predominance because individualized issues predominate, especially on the issue of whether any particular employee was improperly included in the tip pool by virtue of performing duties other than that of a busser, whether any individual worked off-the-clock or worked overtime at all, and whether any individual actually objected to meal break deductions or knew they could have asked for such deductions not to be made.  They contend class certification is premature because discovery is incomplete – Plaintiff cancelled her deposition twice and refused to appear before the June 5, 2025 deadline set by the Court.  Defendants also point to conflicts in Plaintiff's submissions, including that she misrepresents when the restaurant was open for business and omits that she was paid for pre- or post-opening time.  They also point to the fact that records show a significant portion of the proposed class did not work overtime – their hours reflect far less than 40 hours per week.  They say this means that many class members may not have the same injuries as Plaintiff or be entitled to overtime pay.  They also contend that there is insufficient evidence concerning back-of-house employees and delivery workers for them to be included in any class and criticize Plaintiff's reliance on hearsay.

1. **Rule 23(a)**

   a. **Numerosity**

In the Second Circuit, there is a general presumption that if a class has more than forty members it will satisfy Rule 23(a)'s numerosity requirement because joinder of more than that

14

number of parties would be impracticable. *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 99 (E.D.N.Y. 2012). Here, there is no dispute that the proposed class and subclass consist of more than forty individuals. Numerosity is therefore satisfied.

### b. Commonality

To satisfy commonality, Plaintiff must show that there are questions of law or fact common to the class. *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). Said another way, the class claims must "depend upon a common contention . . . capable of classwide resolution." *Dukes*, 564 U.S. at 350. Commonality therefore "turns on the ability of the action to generate common *answers* apt to drive the resolution of the litigation*." Elisa W. v. City of New York*, 82 F.4th 115, 123 (2d Cir. 2023) (quoting *Dukes*, 564 U.S. at 350) (internal quotation marks and citation omitted). The Supreme Court has further explained that the outcome of the common question "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. Commonality under Rule 23(a)(2) "is generally considered a low hurdle easily surmounted." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04-cv-8144 (CM), 2009 WL 5178546, at *9 (S.D.N.Y. Dec. 23, 2009). A single common question of fact or law suffices to satisfy this element. *Dukes*, 564 U.S. at 359. Moreover, claims of individual class members need not be identical. All that is required is that there are "issues whose resolution will affect all or a significant number of" the class. *Johnson.*, 780 F.3d at 137-38.

Here, there are several common issues whose resolution will affect all or a significant number of the proposed subclass of front-of-house tipped employees. That common issue is whether Mission Ceviche provided proper tip credit notice and whether Mission Ceviche

properly computed the overtime rate for tipped employees. Plaintiff's declaration and the

payroll records are sufficient to demonstrate that these are common issues that can be shown

through common evidence at least with respect to front-of-house tipped employees. Plaintiff

provides no evidence of improper tip credit being made for delivery workers and, indeed, no

evidence concerning delivery workers at all. And she acknowledges that back-of-house

employees are not properly included in the proposed tipped subclass. Mission Ceviche does

not meaningfully dispute that it improperly computed the overtime rate for tipped employees,

although it points out that only a handful of employees worked overtime such that a large

portion of the proposed class was not damaged. Nevertheless, as to the threshold issue of

commonality, it is satisfied with respect to the proposed subclass of front-of-house employees

who allegedly were subject to an improper tip deduction.

   Plaintiff argues in a cursory manner that there is commonality as to her claim that

Defendants improperly deducted for meals. She bases her claim on her assertion in her

declaration that she personally felt there was not enough to eat, and she was not provided fruit

or vegetables or offered coffee, tea, milk or juice. She also relies on vague hearsay that five

front-of-house co-workers were "very angry" about meal deductions. She submits no evidence

regarding back-of-house employees or delivery workers. Defendants submit a declaration

describing with more detail the meals provided, stating that it complied with applicable

regulations and documentation indicating that employees were allowed to request and have

meal break deductions removed from their pay. Additionally, the payroll records submitted by

Plaintiff show that meal deductions were not made for everyone, and the handbook submitted

by Plaintiff indicates that employees could raise a concern about deductions from pay with

Mission Ceviche.  Thus, it appears that there are individualized issues regarding whether employees accepted meal break deductions or asked them to be removed.  On balance, Plaintiff has not demonstrated common issues regarding meal break deductions for the proposed class by a preponderance of the evidence.

There is insufficient evidence showing a common policy of requiring off-the-clock work for all employees of the proposed class.  Plaintiff's proof consists of her declaration, which is cursory at best and limited to her own experience, together with uncorroborated and unspecific hearsay from a handful of front-of-house employees that their pay did not reflect all hours worked.  The handbook somewhat contradicts these assertions in that it indicates employees are to be paid for all hours worked and should report to management if their paycheck does not reflect all hours worked.  Plaintiff submits no evidence of off-the-clock work by back-of-house or delivery workers.  *See Fernandez v. Wells Fargo Bank, N.A.,* No. 12-cv-7193 (PKC), 2013 WL 4540521, at *5-6 (S.D.N.Y. Aug. 28, 2013) (concluding that the plaintiff did not establish by a preponderance of evidence that the personal bankers were subject to a common policy to limit their recorded hours or require off-the-clock work; finding value of the declarations limited because they contained hearsay and lacked detail concerning alleged communications from managers about limiting overtime and off-the-clock work, including lack of dates as to when the communications took place, and failed to identify participants in the communications); *Ruiz v. Citibank, N.A.*, 93 F.Supp.3d 279, 289-95 (S.D.N.Y. 2015) (finding that there was insufficient evidence to demonstrate a common policy of failing to compensate personal bankers for overtime worked), *abrogated on other grounds by Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d

502 (2d Cir. 2020). On balance, Plaintiff has not met her burden to show commonality on this issue as to the proposed class.

Similarly, there is insufficient evidence showing there was a common policy of failing to pay spread-of-hours pay to the proposed class. The handbook submitted shows that Mission Ceviche's policy was to pay spread-of-hours pay as required under New York law, and it informed employees to tell management if they believed their pay was incorrect. Plaintiff's declaration does not state that she personally worked more than ten hours in any day and was not paid for it. Indeed, there is no evidence that Plaintiff ever worked more than ten hours in any day. There is no evidence that any other employees in the proposed class worked more than ten hours in any day and were not paid for it. Thus, Plaintiff fails to show commonality as to this issue for the proposed class. *See Bondi v. New Rochelle Hotel Assocs.*, No. 17-cv-5681 (KMK) (LMS), 2018 WL 7246962, at *17 (S.D.N.Y. Dec. 7, 2018) (holding that plaintiffs' anecdotal evidence failed to show a common policy and finding that the declarations provided by plaintiffs were "conclusory and lack[ed] the kind of precision and detail from which the Court might infer a uniform policy on the part of Defendants to deny compensation to their employees.").

Plaintiff's brief is largely silent as to wage notices and is cursory with regard to wage statements. Plaintiff provides no evidence whatsoever regarding non-tipped workers' or delivery workers' wage notices or wage statements. She provides only conclusory assertions about unspecified "conversations" she had with five co-workers about their pay stubs being inaccurate. Additionally, she fails to explain in her declaration what concrete injury she suffered from incorrect wage statements. And her claim that her wage statements were incorrect is

premised in part on it reflecting incorrect hours worked or other incorrect pay – issues that can't be demonstrated by common proof as discussed above.  Other information Plaintiff and Defendants submitted, including payroll records, suggest that at least some members of the proposed class received proper pay such that Defendants may have an affirmative defense to any wage notice or wage statement claim.  Additionally, there is a total lack of evidence of concrete injuries suffered by any member of the proposed class – there are only assertions in the complaint. Thus, there appear to be individualized inquiries needed to ascertain whether there are affirmative defenses to this claim and whether any class member even has a valid claim or concrete injuries from any deficiencies in their wage notices or wage statements. *See, e.g.*, *Chang v. Loui Amsterdam, Inc.*, No. 19-cv-3056 (RER), 2022 WL 4586100, at *12 (E.D.N.Y. Sept. 29, 2022) (quoting N.Y. Lab. Law § 198 (1-b)); *Ying Ying Dai v. ABNS NY Inc.*, 490 F. Supp. 3d 645, 661 (E.D.N.Y. 2020*)* ("Under Section 198(1-b), employers have an affirmative defense if they pay their employe[e]s properly."); *Santiago v. Home Infusion Grp., Inc.*, No. 20-cv-5455 (ENV) (LB), 2022 WL 5175117, at *6 n.11 (E.D.N.Y. June 7, 2022) (recognizing legitimacy of affirmative defense that "complete and timely payment of all wages ... serves as an affirmative defense to a wage notice or wage statement claim.") (internal quotations and citations omitted), *report and recommendation adopted*, 2022 WL 17798164 (E.D.N.Y. Dec. 19, 2022); *Tortorici v. Bus-Tev, LLC*, No. 17-cv-7507 (PAC) (KHP), 2021 WL 4177209, at *14-15 (S.D.N.Y. Sept. 14, 2021) (recognizing affirmative defense pursuant to NYLL § 198(1-d) that to failure to provide proper wage statements under Section 195(3) where Plaintiff was always paid in timely manner).

The Supreme Court has made clear that every class member must have Article III standing in order to recover individual damages and that plaintiffs must demonstrate standing

for each claim that they press and for each form of relief that they seek. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). And, in a recent case interpreting *TransUnion LLC*, the Second Circuit held that a plaintiff must show "some causal connection between the lack of accurate notices and the downstream harm" sufficient to confer Article III standing. *Guthrie v. Rainbow Fencing Inc*., 113 F.4th 300, 308 (2d Cir. 2024). As noted above, Plaintiff says nothing in her declaration about her concrete injuries from the allegedly improper wage notices and wage statements she received or the injuries of any other member of the proposed class.

For all these reasons, Plaintiff has failed to show commonality with regard to the proposed wage notice and wage statement claims of the proposed class by a preponderance of evidence. *See Charles v. Pinnacle Too, LLC*, No. 22-cv-4232 (DEH) (JW), 2024 WL 4491560, *13 (S.D.N.Y. Oct. 15, 2024) (observing that a finding that plaintiffs were paid the wages they were owed eliminates the basis for finding a concrete injury sufficient to establish standing, such that, "no wage violations [means] no standing").

Thus, Plaintiff has demonstrated threshold commonality only as to the improper tip credit claim for a subclass of front-of-house tipped employees.

### c. Typicality

The typicality requirement is "not demanding." *In re EVCI Career Colleges Holding Corp. Sec. Litig*., No. 05-cv-10240 (CM), 2007 WL 2230177, at *13 (S.D.N.Y. July 27, 2007). It is satisfied if "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (internal quotation marks omitted). Thus, where

the claims of a class stem from a single course of conduct, "the commonality and typicality requirements of Rule 23(a) tend to merge." *Dukes*, 564 U.S. at 349 n.5 (quoting *Falcon*, 457 U.S. at 157–58, n.13) (cleaned up).

For largely the same reasons discussed above, the only claim for which Plaintiff has demonstrated typicality is with respect to the improper tip credit claim for the proposed front-of-house tipped subclass. See *Fernandez*, 2013 WL 4540521, *13 (noting the same reasons for finding no commonality supported a finding of no typicality).

### d. Adequacy and Ascertainability

The fourth element of Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). When assessing this element, the Court also evaluates whether Plaintiffs' attorneys are qualified, experienced, and able to conduct the litigation and whether Plaintiffs' interests are antagonistic to those of the proposed class. *Baffa v. Donaldson, Lafkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997). Here, Defendant does not contest the adequacy of Plaintiffs' counsel, who the court finds is adequate based on the submissions and counsel's experience handling hundreds of wage and hour cases, including class cases.

Defendants contest the adequacy of Plaintiff serving as class representative because they argue she has a conflict with the back-of-house employees she seeks to represent insofar as they allegedly improperly received tips. This conflict argument has merit but is moot given the Court's findings above. Plaintiff is adequate to represent the proposed subclass of front-of-

house tipped workers allegedly subjected to an improper tip credit and who were consequently paid the incorrect rates, as she herself says she has these claims and defendants offer no compelling reason to find otherwise.

Courts impose an ascertainability requirement when determining whether class certification is appropriate.  This requirement means that it must be "administratively feasible for a court to determine whether a particular individual is a member of the class [and t]he Court must be able to make this determination without having to answer numerous individualized fact-intensive questions." *Fogarazzao v. Lehman Bros.*, 232 F.R.D. 176, 181 (S.D.N.Y. 2005) (cleaned up).  The Second Circuit has described ascertainability as a "modest threshold" to meet that "will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *In re Petrobras Sec.,* 862 F.3d at 269.  Here, Defendant does not contest ascertainability and, in any event, the court finds that the proposed members of the front-of-house tip credit class are ascertainable through reference to personnel and payroll records.

### 2.  Rule 23(b)

In light of the above, I address Rule 23(b)(3) only with regard to the proposed front-of-house tip credit class.  To obtain certification under Rule 23(b)(3), common issues must predominate, and class treatment must be superior to individual actions.

"'Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) (quoting *Roach v.*

*T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015)). This requirement is "far more demanding" than the commonality requirement under Rule 23(a)(2). *Amchem Prods.*, 521 U.S. at 623–24. Designed to test the proposed class's cohesiveness, the predominance inquiry "asks whether the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating individual issues." *Tyson Foods, Inc. v. Bouaphekeo*, 577 U.S. 442, 453 (2016) (cleaned up).  This is a qualitative, not quantitative, inquiry, where the Court "must account for the nature and significance of the material common and individual issues in the case." *In re Petrobras Sec.*, 862 F.3d at 271. "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Tyson Foods, Inc.*, 577 U.S. at 453 (quoting 7AA C. Wright, A. Miller, & M. Kane, Fed. Prac. & Proc. § 1778, pp. 123-24 (3d ed. 2005) (footnotes omitted)).

That damages may need to be determined on an individualized basis does not defeat certification. *Roach*, 778 F.3d at 405-07 (holding that damages do not need to be "measurable on a classwide basis" to satisfy Rule 23(b)(3) predominance; interpreting *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), as requiring only that "a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury" and not "that proponents of class certification must rely upon a classwide damages model to demonstrate predominance").  Thus, courts recognize that in the wage and hour context, "establishing a uniform practice or scheme" that deprives the proposed class of overtime wages "may constitute a significant step towards establishing

liability to all class members" and justify a finding of predominance even if exact hours worked cannot be proven on a classwide basis. *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 148 (S.D.N.Y. 2002); *see also Ramos v. SimplexGrinnell LP*, 796 F. Supp. 2d 346, 359 (E.D.N.Y. 2011) (noting that wage claims are especially suited to class litigation despite differences in hours worked, wages paid, and wages due), *vacated in part on other grounds*, 773 F.3d 394 (2d Cir. 2014).

Here, Plaintiff has proposed a common method of determining liability and computing damages for those members of the front-of-house tipped employees.  By reviewing payroll records, the parties can easily ascertain who in this class was short-changed on pay given that it is undisputed Defendants did not apply the proper tip credit rate to overtime.  Similarly, common testimony about tip credit policy and notice and payroll records can reveal who among this group who did not work overtime are due additional straight time pay.  The court also finds that given the low dollar value of the individual claims, the relatively modest size of the class, the fact that all members of the class worked in one location and that common evidence will be used to prove the claims, superiority is satisfied.  Thus, Plaintiff has satisfied Rule 23(b) as to this class.

## CONCLUSION

For the reasons set forth above, the motion for class certification is granted insofar as the Court certifies a class of front-of-house employees of Mission Ceviche UES with respect to their claim that they are due additional straight time and/or overtime pay because of defects in the tip credit notice, failure to maintain a daily log of tips, and miscalculation of the tip credit

overtime rate.   Because Mission Ceviche UES did not open until sometime in 2019, the class period runs from the date Mission Ceviche UES opened in 2019 to the date of this Opinion and Order.  The motion for class certification is otherwise denied.

The parties shall meet and confer regarding proposed class notice and submit such notice to the Court by no later than September 26, 2025.  Insofar as discovery is complete, any motion for summary judgment on Plaintiff's or the opt-in Plaintiffs' individual claims is due October 31, 2025.  No pre-conference letter is required.  Opposition to any summary judgment motion is due November 28, 2025.  Reply due December 12, 2025.

A pre-trial conference is scheduled for February 17, 2026, at 10:00 a.m. in Courtroom 17D.

The Clerk is respectfully directed to terminate the motion at ECF No. 49.

**SO ORDERED**

Dated: September 12, 2025
       New York, New York

_Katharine H. Parker_

KATHARINE H. PARKER
United States Magistrate Judge